17-1451 Par Pharmaceutical, Inc. v. Horizon Therapeutics, Inc. Good morning. May it please the Court, Aziz Birney on behalf of Par Pharmaceutical. Your Honor, the central dispute in this case is whether the prior art taught the limitation of about 60 percent. In evaluating whether that limitation is found in the prior art, the Board committed multiple legal errors. First, the Board failed to consider the prior art as a whole. Instead, it used an unprecedented balanced picture test. Under that newfound test, the Board ignored rates, conversion rates at or below 60 percent, thereby creating a false dichotomy of right and wrong. Isn't another way of looking at it is that the Board precisely did consider the art as a whole so that when you pointed to the 1919 article by Sherwin, it said, well, we really need to know what 60 years later, 70 years later or something, a skilled artisan would have thought about that in context of the overall prior art. And by then, indeed, 14 years later, there was pretty good reason to discount that 1919 piece. No, Your Honor. What they did was they did a balancing. And under this Court's precedent, that's not the appropriate test. It's not a balancing. It's not a weighing of the evidence. Well, you're not saying never. Doesn't it really depend on the issues as they arise in the case? They do, Your Honor. But that's not what happened in this case. In this case, they didn't look at the prior art as a whole. The requirement is to look at all art, irrespective of when it's published. You're supposed to look at the prior art as a whole from earlier to up until the time of the priority date. And that's not what happened in Sherwin-19. What do we have other than Sherwin-19 that supports a conversion rate of about 60 percent? Sure. So as Your Honor alluded to, Sherwin-19 itself discloses conversion rates of 50 to 60 percent, which overlap. For one individual. I'm sorry? For one individual. That is correct. With respect to other art, there was also the Compte reference, which discloses PAA conversion of 54 percent. And notably, the Compte reference was published in 2002. But that's for another compound, right? It's not the same compound. It's part of the claimed compounds in this case, Your Honor. But can I ask a different question about Compte? Sure. Where precisely before the board did you rely on Compte? For this proposition? For purposes of the grounds that we advance? For purposes of showing a conversion rate more like the one that is claimed here. I was struck, I guess, by the – I'll call it a fact, but you can tell me if I'm wrong about that. In your 17 or 18 page recitation in the blue brief about your affirmative case of obviousness, you, I think, very carefully referred to Compte once only in a footnote. Made me think, and I don't think the board really talked about Compte on the conversion rate principle. So I guess my question is, did you, and if so, show me where in your petition say, look at the conversion rate in Compte, we rely on that? We do disclose and rely upon the Compte reference. That's part of the institute and grounds. And specifically with respect to the board relying on it, they did make a factual finding that the Compte reference does disclose a conversion rate of about 53, 54 percent. But the error that the board made is they did not apply the teaching in Compte with respect to its obviousness analysis. Where in the board opinion does it discuss Compte? That is found – it's in Appendix 17, spanning Appendix 18, Your Honor. So the issue here is that the board failed to address the prior art as a whole. That was the first error. Under this court's precedent in Iron Grip and Tyco, if there is prior art that discloses the claim range, then the board is obligated to apply the presumption of obviousness. And that's what they failed to do in this case, thus leading to the second error. But wait, come back to the question of what you had in the record here that supported you. You mentioned Sherwin-19 and Compte. Is there anything beside those two? So there's Kazimoff as well, Your Honor. Kazimoff uses the data that was in Compte, but it was published in a separate journal. It was published in 2004, which actually post-dates all of the prior art references that Pat Nona relies on in this case. So with respect to the board's findings about Sherwin or their lack of use of Sherwin being earlier in time, that's not appropriate because later references do disclose an incomplete conversion, and specifically the 53 and 54 percent. But what the board is saying is that the overwhelming view was that there was a prior art reference that was 100 percent or near 100 percent conversion rate, right? That was what they concluded. That's what they mentioned, but again, that error stems from the fact that they didn't consider the prior art as a whole. Had they looked at other art, they would have seen lower conversion rates. And specifically... By other art, you mean Sherwin-19 and Compte, right? Sherwin-19, Compte, and Kazimoff definitely disclose incomplete conversion rates. The other issue to compare... But aren't they... Suppose they look at the entirety, which they seem to have done, and say the overwhelming view was 100 percent, and under these circumstances, these two references don't render it obvious. Are they not entitled to do that? I'm sorry, can you repeat your question? They found isolated references, one of which was very old, suggesting a lower conversion rate, one perhaps in the area of 60 percent. But they said that the overwhelming view in the art was 100 percent. Are they not entitled to conclude from that that the art would not have suggested using a 60 percent rate? I would disagree with that, Your Honor, just because we do have other references that disclose lower conversion rates. And more importantly, there are legal safeguards that this court has put in place with respect to looking at the prior art as a whole when the obviousness analysis is conducted. And specifically, as Your Honors well know, in the Iron Grip case, once there is a claim range that is found in the prior art, then the burden of production shifts over to patentee to provide evidence with respect to teaching away or criticality of that range. And with respect to unexpected... I'm sorry, with respect to teaching away, the board found that there was no teaching away. They rejected patent owners' teaching away arguments. You've been making much out of this presumption. I gather you're telling us that we presume it obvious even though there's no evidence of obviousness. I don't see you drawing any distinction between the shifting of the burdens of production and a presumption. And again, your brief is very heavily loaded with saying you have to presume it obvious even though we have no evidence or the evidence is only of a range. I would disagree with that, Your Honor. And specifically, in our briefing from pages 32 through 50, we do recite our prima facie obviousness analysis specifically with respect to all... That's not a presumption. That's a shifting of the burdens of coming forward. Understood, Your Honor. But we do, to your question regarding other evidence, we do have other evidence with respect to the obviousness case. The issue becomes the board was obligated to apply that presumption because there were lower conversion rates that were taught. And again, as I alluded to earlier with respect to teaching away, the board rejected all the teachings away and there was no evidence with respect to criticality that the patent owner submitted whatsoever in this case. And so... I've been looking for the prima facie case to start with and all I keep coming upon is saying you're telling us there's a presumption. We do also have the prima facie case. Like I said, Your Honor, we've made multiple arguments in our brief. One is the presumption, but we've also put forward our prima facie case, obviousness case in our briefing. So we have that presented on pages 32 through 50 of our brief, as I mentioned. But really, the issue becomes that had the board not disregarded the prior art with lower conversion rates... They didn't disregard it. They discussed it. They didn't apply it to their obviousness analysis, Your Honor. That's the error. We're saying that because there was prior art with lower conversion rates, they were obligated to apply the test that's presented and that's the presumption of obviousness in this case. So with respect to the analysis here, as I alluded to, that's what led to the second legal error that the court committed. They exclusively relied on prior art with higher conversion rates without properly regarding and giving credit to conversion rates with lower conversion rates. I'd like to shift real quickly and address one other issue that PatentOwner has raised in their red brief, and that is with respect to their argument that the Bruce Law 91 does not teach any of the limitations in the independent claims with respect to calculating an effective dose. And contrary to the PatentOwner's argument, Bruce Law 91 does teach calculating an effective dose based on conversion of the drugs to PAGN. Dr. Sonheimer, who's the only expert of record in this case, provided expert testimony that the dose in each period in Bruce Law 91 was up to the calculations at Appendix 15 and 16 in this case. And specifically with respect to the board's finding, the board at Appendix 15 goes through its analysis to show that the patient's protein intake was used to calculate the required waste nitrogen and then that waste nitrogen was used to calculate the target urinary PAGN, which is one of the elements in Claims 1 and 8. And then that target urinary PAGN was used in turn, in other words, performing a series of calculations to calculate the doses of PAA, a project to be administered. Can I just ask you, maybe when you get up on rebuttal, you can point me to the pages in your petition where you make a specific argument based on Compt? I can provide that on rebuttal, yes, Your Honor. I just don't have that handy. And so for those reasons, Your Honor, we respectfully ask that this court reverse the board's finding with respect to obviousness. Thank you. We'll save you rebuttal time. Mr. Greene. Good morning, Your Honor. Robert Greene on behalf of Horizon. Let me start by... So you've got a one-on-one problem here, right? It's not exactly involved because it's a board proceeding and an IPR, but you've got a one-on-one problem. This looks an awful lot like a Mayo patent, right? I would say it's distinguishable. In fact, it requires not only a determination of a dose, but a treatment that's then made to the UCD patient based upon that dose. There's an active step that's required in this. It's more than just a calculation. It's actually a requirement for the treatment. Is there a pending litigation in district court about one-on-one? The litigation related to this actually was filed in the Houston District, Texas. That is a one-on-one issue by part in that case. It's not going to trial and it's been stayed. There's a potentially interesting issue here under the decision in Praxair about the relationship between one-on-one and one-on-three. It's not been raised here. You're familiar with Praxair? In general, yes, Judge. We do not believe that there's a one-on-one issue here in view of the fact that there's more than just a thought process that's involved. This is no different than any other treatment claim in the pharmaceutical industry where there is a determination made as to the dose and the dose is then applied. That's exactly what's happening. I don't mean to take up your time with that, but one-on-one is not involved. It is not in this case at this time. That's right. At the district court, that's a different issue to be dealt with by the judge at a future time. Let me address a few things here. First, clearly the board spent a lot of time looking at the underlying references and they came to a conclusion. That conclusion was that the state of the art that was used in the petition by par was not representative of the art at the time, the pertinent time. That was a fact finding by the district court. I'd say that alone was the basis then for moving forward with the decision that was made by the board. They looked at the references and if you go, for example, to one of the references. I understand very clearly what the board said at your urging about Sherwin 1919. What did the board say about Compt? They said very little other than the fact they acknowledged that it existed. There was no real effort made by par to emphasize the teaching of Compt. I just saw in the petition there's a single sentence footnote, I think on page 111 of the appendix. Nevertheless, Compt has this percentage in it that's lower than 60. Well, it's a lot lower than 60. It involves several different kinds of compounds, but there's no board analysis to say, there's board analysis saying if you look at Sherwin 1933, I can discount Sherwin 1919. I don't see a counterpart to that in the board's discussion of Compt, which aside from everything else is much more recent. I would agree there is no specific discussion, but the board did point out when it first addressed Compt that there was more to Compt than simply testing that they needed to look at. Sure, there was an eight hour time frame during which they collected the sample. Not 24. 24 is a standard in the art. In fact, the testimony from the expert, Dr. Sonheimer, in this matter, was that the values that were set forth in Compt did not relate to a 24 hour process and that there was continued flow, if you will, of the glycerol phenyl butyrate that was still coming out at the eight hour time frame. Inherently, I think all that happened here is the board looked at this and said, well, what good is this data point? It was admitted that the testing actually had not been done over what was then accepted to be a 24 hour period. The existence of the conjugate that occurs after the administration of a PAA pro-drug takes some time. There's a reason why you see in the references the vast majority, if not all, other than this, go to a 24 hour time frame. And the expert declaration that you were just talking about is your expert declaration? No. It was a patent owner's. I'm sorry, I'm confused. Whose expert was this? It was PARS. PARS expert, yes. At a reply stage? No, it didn't submit any expert testimony at the reply stage. With its petition or what? With the petition, Judge. So in your patent owner response, did you have anything either in your lawyer's document or your expert document addressing COMPT? We did not have an expert to address it, but we did address, for example, Dr. Sondheimer's declaration, its appendix 175, where he specifically said the summed value of what was determined to have been the result of the administration of the drug understates excretion. This is their expert that says it understates excretion. So you just relied on their expert, and then did they come back in their reply, again, their lawyer's document and their reply, and address that about COMPT? The only issue that they addressed was there was testimony during a deposition by Dr. Sondheimer that he thought his view, unsupported totally, was that, well, it really had tapered off. Well, indeed, it did taper off. It was still being reviewed on an ongoing basis until they stopped at eight hours, and at that point in time, there still was PAGN that was being determined at that point to exist. The other problem, though, with COMPT is the value here. The value is not 54. The value is actually 32.6. That's a conversion to PAGN. That's what we're talking about here, Judge. They found, for whatever reason in the testing that they did, they found another agent, PBGN, which was also determined to exist at that time. The data points in here, as I said, they're not substantive. They don't have support based upon normal approach to doing a study like this. The dosing of this was five grams. If you look at the art that's in the record, again, Dr. Sondheimer, when he was addressing the data points, going back to the 2019 version, showed that there were four data points. What Dr. Sondheimer said was the only ones that I considered to be useful, in essence, were those that were based on 10 and above. The two data points at 10 and 15. When they were back and looking at the underlying prior art from SHER-119, their own expert said, I need to look not at the five gram dose, I need to look at the 10 and above. That's what they looked at. The board is made up of underlying experts in this field as well. The board looks at this and says, what are we supposed to do? The 24 hour time frame wasn't used. It was cut off before we could determine how much was determined to exist. We look at the data here and it's not the 54 that they're asserting it to be, it's in the 36 range. Inherently, if you're a person of ordinary skill in the art, you see that teaching at Compte, I think you simply set it aside. What did the board say about Compte in the initiation decision? My recollection is that they did not rely on it. Compte was part of the decision to move forward, but there was really no discussion. They had in the decision to institute a statement about what Compte was, but that was it. There was no discussion about why Compte was actually included in that, other than the fact that it was requested by Parr at the time. In requesting institution, what did Parr say about Compte? In my recollection, Your Honor, they said essentially nothing other than the footnote, which appears in their response. Again, I think Compte is a red herring and Kazimoff is data that comes from Compte. The problem is that maybe Compte could be dismissed. The problem is that it wasn't really addressed by the board. It was considered, though, Your Honor. Clearly, if you look at their final written decision, they referred to it as part of the institution decision on ground one. They captioned their determination on that decision by saying that Compte is part of it. What they said was basically what Horizon set forth was evidence that the values that were being used at the critical time were those that were in the 90 to 100 range. What they also relied on was when you look at the references that were involved that they relied on, such as Sherwin-33, the Bufenil label, and our position on SHPL-22, which was a reference that they brought to the table, we argued in each of those cases. Sherwin-33, there was a 24-hour time frame, 95% conversion. SHPL, their reference, 95% conversion. Bufenil, which PAR indicates shouldn't be given any consideration whatsoever, of course, is a label that was set forth based on standards from the FDA. To say that there should be no credit given for what's on the Bufenil label, I think is ignoring the fact that it actually was endorsed by the FDA. PAR addressed none of that. None. We put those issues on the table and what did they say to PTAP? Nothing on those points during the proceeding. What was the board supposed to do at that point? They took a look then at the prior art, they saw the prior art that was relied upon by Horizon, saw that this was timely, decided to decide the case on that basis, and in fact said very specifically, PAR took no position on these. Another point, which I think is quite important in this case, if you look at the prior art as a whole, and the question really is, what was POSA going to look at? Go back and take a look at Bruce Hullo 647 patent, 1980. What's he cite to? Does he cite to SHPL? I'm sorry, to Sherman 19? He does, but only for a totally different proposition than the conversion rate of PAA to PHEN. Instead, what's he cite to for that purpose? Sherwin 33. And what's he say? There was a conversion rate of 95% shown in Sherwin 33. He also points to that purpose clearly to establish the database that he was then using in the testing at that point. You can't ignore the fact that he was an expert. He is the one that actually came to the forefront and established the use of PAA programs or PAA itself to treat UCD. He is the icon in that, and for him to ignore specifically Sherwin 19's teaching and instead to point to Sherwin 33, I think tells anyone of skill in the art that Sherwin 19, as we have argued but was not adopted by the board, in fact is a reference which would not have been considered at the time of the invention to be telling with respect to exactly what the, at the time, the PAA to PHEN conversion rate would have been. I can't imagine anyone that would have better set of background credentials than Sol Vercelot can solve. There are many other issues, Your Honors. I see I'm down to 46 seconds or so that I would like to address, but if you have any specific questions with my short time left, I would be pleased to address those. Any more questions? Any more questions? Well, thank you, Mr. Green. Thank you, Judge. Mr. Berger. Thank you, Your Honor. Judge Toronto, with respect to your question about citations to COMP, we did cite COMP, as you mentioned, on Appendix 111. In addition to in our petitioner's reply at pages 20, appendix pages 2298, also appendix pages 2306 through 2308. Judge Dyke, with respect to your honor about a different drug. The drug in COMP is sodium phenyl butyrate. It is a prodrug, a PAA, and that's what's claimed in the 012 patent, and specifically there's an explanation regarding that at appendix 165. Judge Newman, with respect to your question about Sherwin and the fact that it was earlier in time and what the board said about Sherwin-19, that doesn't take away from the fact that there was no discrediting of Sherwin-19. Specifically, the board made a specific finding that Sherwin-33, that Pat Nona relies upon, did not discredit Sherwin-19. So, from that perspective, Sherwin-19 is still good prior art, and as I mentioned earlier, is consistent. The later prior art has disclosures of PAA conversions that are consistent with the Sherwin-19 reference. Absent any teaching away, any discrediting, or any other unexpected results with respect to the claimed range, it's error for the board to discount and disregard the Sherwin-19 reference. The other thing I'd like to mention regarding Sherwin-33, which is what the Pat Nona relies upon, that reference does not measure PAGN conversion, which is the claim limitation in this case. What it measures is PAA, and that's different than what's presided in the patent claim. So, from that perspective alone, that's not even art that should be considered, and we have made that argument all along, and we did make that argument down below. And specifically, those are at appendix pages 2303 through 2306. I think that's all I have, unless your honors have any further questions. Any more questions? Well, thank you. Thank you, Your Honor. Thank you. Thank you both. The case is taken under submission.